# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SENTRY SELECT INSURANCE CO., | ) |
| Plaintiff, | ) |
| | ) 2:07-cv-01049-RLH-LRL |
| v. | ) |
| | ) **DECISION and ORDER** |
| DEAN MEYER, et al., | ) |
| Defendants. | ) |

This case comes before the court on plaintiff Sentry Select Insurance Company's ("Sentry's") Motion to Disqualify the Doyle Firm and Attorneys William Doyle and Amy Honodel (#185). The court has considered the motion, defendants Michael Thieman ("Thieman") and Insurance Company of Hannover's ("Hannover's") Response (#190), Amy Honodel's separate Response (#189), and plaintiff's Reply (#191). For the reasons that follow, the motion is granted in part.

## BACKGROUND

This is a declaratory relief action in which Sentry seeks a determination that it is not obligated to provide coverage for Mr. Thieman or anyone else in connection with a $5.5 million judgment in favor of Lance Otterstein and against Mr. Thieman in an underlying Nevada state personal injury action. In the alternative, if the court were to determine that under an MCS-90 endorsement Sentry is obligated to pay all or some portion of the underlying judgment, Sentry seeks a determination that it may recover the payment from Mr. Thieman and/or his insurer, Hannover.

The underlying action arose out of a November, 2001 vehicular accident in which a

tractor-trailer rig driven by Mr. Thieman collided with a motorcycle driven by Mr. Otterstein, resulting in significant bodily injury to Mr. Otterstein. It appears that at the time of the accident Mr. Thieman was employed by Murray Transportation, which had leased the tractor-trailer rig from Dean and Billie Meyer (collectively "the Meyers"). The Meyers operated as a federally certified interstate motor carrier, and were the owners of the tractor-trailer rig in question. Murray Transportation, which was a federally certified interstate motor carrier, insured the leased tractor-trailer rig through Hannover. The Meyers' vehicles were insured by Sentry. The Meyers allege, however, that when Murray Transportation leased the rig and insured it through Hannover, the Meyers removed the rig from the Sentry policy. Sentry therefore contends that at the time of the accident the policy it issued to the Meyers did not cover the rig in question.[1]

In April, 2003, Mr. Otterstein filed the underlying personal injury action against Murray Transportation and Mr. Thieman in the Eighth Judicial District Court.[2] Hannover retained the Doyle Firm to represent both Murray Transportation and Mr. Thieman. Attorneys William Doyle and Amy Honodel were assigned to defend both defendants.[3] The limit of Hannover's liability policy was $1 million. Mr. Otterstein's medical specials well exceeded $300,000.

In February, 2005, Mr. Otterstein's counsel, Matthew Aaron, offered to release all defendants in exchange for Hannover's policy limits of $1 million. Defendants did not respond to the offer. Following an attempt at mediation on March 17, 2006, during which Hanover disclosed that the Doyle Firm would defend Murray Transportation and Mr. Thieman under a reservation of rights, Mr. Aaron faxed a letter to Ms. Honodel on March 22, 2006, in which he noted that "[i]t is certainly clear now, as I have stated in the past, that in order to avoid the

---

[1] Hannover alleges that prior to the accident Murray Transportation's lease of the rig from the Meyers had been terminated, and control of the rig had been returned to the Meyers.

[2] Murray Transportation is not a defendant in the action *sub judice*.

[3] Ms. Honodel is no longer affiliated with the Doyle Firm.

2

appearance of a conflict of interest, your clients need the advice of personal counsel." Exhibit 7 to Sentry's Motion to Disqualify (#185-3). On the very next day, March 23, 2006, Mr. Doyle advised Hannover in an email that although Hannover's reservation of rights as to Mr. Thieman "may not technically create a conflict, ... on a practical level there is no question a conflict exists." Exhibit 4 to Sentry's Motion (#185-1). Mr. Doyle went on to say:

> For example, since Hannover is controlling the defense of Murray I can only assume that you will be directing us to defend Murray on the basis that there (sic) are not involved as a result of no ownership of the vehicle. This potentially leaves Thieman exposed on several fronts. In addition the ROR potentially gives Thieman a right to cut a deal with the Pltfs to protect himself. This deal is potentially adverse to Murray since Murray may be vicariously liable if the jury concluded that Murray still owned the truck. I can't see how I can represent Thieman and do what is necessary to protect him while at the same time represent Murray....There (sic) interest are potentially adverse and I don't think we can represent both.

*Id.*

Nevertheless, during the same period of time, the Doyle Firm was, in Mr. Doyle's words, engaged in "continuing" settlement discussions with Otterstein's counsel on behalf of Murray Transportation and Mr. Thieman "concerning Mr. Thieman stipulating to a judgment and assigning his rights against Sentry for its failure to defend and protect him." Exhibit 6 to Sentry's Motion (#185-3).

On or about May 7, 2006, attorney Jerry Busby substituted into the state case and became Mr. Thieman's attorney of record instead of Mr. Doyle and Ms. Honodel. Nevertheless, at his deposition in November, 2009, Mr. Doyle testified that he (Mr. Doyle) negotiated the settlement of the state case on behalf of both Murray Transportation and Mr. Thieman. Mr. Doyle admitted that during the negotiations he didn't speak with Mr. Busby or with Mr. Thieman.

On June 14, 2006, Otterstein entered into a written settlement agreement with Murray Transportation and Hannover according to which, in return for Hannover's payment of $500,000.00 to Otterstein, Otterstein would dismiss all claims against Murray Transportation and Hannover. *See* Exhibit 1 to Sentry's Motion to Disqualify (#185-1). The agreement expressly provided that the parties acknowledge that "other arrangements exist governing the

3

claims made by OTTERSTEIN against MICHAEL THIEMAN, ... and understand the agreement between OTTERSTEIN against MICHAEL THIEMAN will be incorporated into separate written representations and agreements apart from this Agreement.  OTTERSTEIN agrees not to compromise on a policy limits demand to any carrier providing coverage to MICHAEL THIEMAN and/or MEYER TRANSPORTATION." *Id.* at ¶ 4.

With regard to Mr. Thieman, Mr. Otterstein signed a Covenant Not to Execute and Release on August 4, 2006. *See* Exhibit 2 to Sentry's Motion to Disqualify (#185-1). Paragraph 9 of the Recitals states: "Based upon the facts and circumstances regarding the claim, it is determined that there is a reasonable likelihood that a verdict could be rendered in favor of Plaintiff and against Thieman and that the range of such verdict could be $4.7 million." Under the Covenant, Mr. Otterstein agreed not to execute "under any circumstances and for any purpose" upon any judgment stemming from the state action. *Id.* at 2.  "In order to mitigate the risk associated with litigation," *id.* at 3, the Covenant provided that Mr. Thieman accepted an offer of judgment from Mr. Otterstein in the amount of $5.5 million, and agreed to pursue a claim against Sentry for the benefit of Hanover.  The Covenant further provided, however, that if Mr. Thieman "fails to cooperate in the pursuit of any claim against Sentry Select Insurance Company or affiliated companies, [Otterstein] has the right to execute against the entire judgment of ... $5,500,000." *Id.* at 5-6.  The Covenant provided that it shall be binding and effective as to Mr. Otterstein and Mr. Thieman "upon execution of this agreement by [Otterstein] solely." *Id.* at 6.  The Covenant was signed by Mr. Otterstein.  It did not call for Mr. Thieman's signature. Six months later, on February 5, 2007, Ms. Honodel of the Doyle firm signed an Acceptance of Plaintiff's Offer of Judgment on behalf of Mr. Thieman.  The judgment was in the amount of $5,500,000.00. *See* Exhibit 3 to Sentry's Motion to Disqualify (#185-1). This document didn't call for Mr. Thieman's signature either.

Mr. Thieman was deposed in October, 2008.  Notwithstanding that the Doyle Firm had filed an answer on Mr. Thieman's behalf in September, 2007, Mr. Thieman testified he was

4

1 unaware that Sentry had sued him until July or so of 2008.  Thieman deposition at p. 27, l. 15
2 to p. 28, l. 6, attached as Exhibit 5 to Sentry's Motion to Disqualify (#185-2).  He learned of the
3 suit when Ms. Honodel of the Doyle Firm called him one day, and told him she represented him.
4 *Id.* at p. 22, ll. 5-14.  But he didn't know that the Doyle Firm also represented Murray
5 Transportation.  *Id.* at p. 71, l. 22 to p. 72, l. 3.  Mr. Thieman further testified that toward the end
6 of the litigation he had another lawyer named Jerry Busby, with whom he spoke on the phone
7 three or four times but never met.  *Id.* at p. 23, l. 9 through p. 24, l. 13.  On May 7, 2006, Mr.
8 Thieman signed a Substitution of Attorneys whereby Mr. Busby substituted for the Doyle Firm
9 as to Mr. Thieman only.  *Id.* at p. 37, l. 15.  Mr. Thieman testified that Mr. Busby was supposed
10 to be representing him "on the latter half of the lawsuit," and Ms. Honodel was no longer
11 supposed to be representing him from that point on.  *Id.* at ll. 11-20.

12 Mr. Thieman testified that when the lawsuit ended, Mr. Busby told him the parties agreed
13 to settle for $5.5 million, and that "I had to sign a paper and it was a done deal, and that they
14 couldn't come after me for anything else, as far as I remember."  *Id.* at p. 25, l. 15 through p.
15 26, l. 6; *id.* at p.96, l. 22 through p. 97, l. 1.  On December 21, 2006, Mr. Thieman signed
16 another Substitution of Attorneys, this time reversing the original substitution, with the Doyle
17 Firm substituting back into the case on Mr. Thieman's behalf, and Mr. Busby withdrawing as
18 his lawyer.  *Id.* at 62, l. 10 through p. 63, l. 2.  Mr. Thieman didn't know why the lawyers were
19 substituting in and out of the case; nobody ever talked to him about it.  *Id.* at p. 63, l. 16 through
20 p. 64, l. 10.  He didn't know until the day of his deposition in this case that Sentry could go after
21 him for money if Sentry ends up owing money to Mr. Otterstein.  *Id.* at p. 110, ll. 7-21.  He
22 didn't recall ever seeing the above-referenced Covenant.  *Id.* at p. 39, l. 18 to p. 40, l. 11.  Nor
23 did anyone ever tell him he was required to assist in bringing a lawsuit against Sentry, and that
24 if he didn't do so, Mr. Otterstein could execute on the entire $5.5 million judgment against Mr.
25 Thieman.  *Id.* at p. 57, l. 19 to p. 58, l. 14.

26 Ms. Honodel was deposed on November 11, 2009.  She was asked how Mr. Busby came

5

1   to represent Mr. Thieman in or about May of 2006.

2      A.    I believe Jerry Busby assumed representation of Michael Thieman because we believe there potentially may have been a conflict in our continued representation of Bob Murray and the representation of Mr. Thieman.

I don't know how Jerry Busby came to be the attorney who did that. I just know that there was that potential conflict. We wanted to make sure that Thieman had counsel who was just representing him.

Q.    Okay. What were the issues that you identified as a potential conflict of interest?

A.    Essentially the coverage issues, at least in my mind. I wanted to make sure that if I was going to be arguing on behalf of Bob Murray, I did not need to worry about whether or not Thieman had coverage or whatever was going to happen at trial.

Honodel deposition at p. 108, l. 20 through p. 109, l. 9, attached as Exhibit 9 to Sentry's Motion to Disqualify (#185-4). In connection with the Covenant Not to Execute -- which Mr. Thieman did not sign, and which provided that if Mr. Thieman didn't cooperate in pursuing a claim against Sentry, Otterstein would have the right to execute on the entire $5.5 million judgment against Mr. Thieman -- Ms. Honodel was asked whether she understood why the agreement wasn't signed by Mr. Thieman. She testified that she did not.

Q.    At any time after you resumed the representation of Mr. Thieman, did you discuss with him the contents of this document?

A.    I don't recall having a discussion with him about the contents of this document.

Q.    Okay. To your knowledge, did Mr. Busby make any demands on Hannover to settle the case on Mr. Thieman's behalf when the $5.5 million offer of judgment was made?

A.    I don't know if Jerry did that or not.

*Id.* at p. 135, ll. 1-10. With regard to Mr. Thieman's Acceptance of Plaintiff's Offer of Judgment, Ms. Honodel testified as follows:

Q.    I've handed to you Michael Thieman's Acceptance of Plaintiff's Offer of Judgment, which is dated February 5, 2007, and this was signed by you?

6

| | | |
|---|---|---|
| 1 | A. | Yes, that's my signature. |
| 2 | Q. | After you substituted back in as counsel of record for Mr. Thieman? |
| 3 | A. | That's correct. |
| 4 | | * * * |
| 5 | A. | Yes, the acceptance of offer of judgment is signed after the covenant not to execute was signed. |
| 6 | Q. | And then turning back to page 3 under 2(a), it was signed after the recital that Thieman agrees to accept an offer of judgment from plaintiff in the amount of $5,500,000? |
| 7 | | |
| 8 | A. | Yes. |
| 9 | Q. | Okay. At what point in time did Michael Thieman consent to the acceptance of this offer of judgment? |
| 10 | | |
| 11 | A. | I don't know. |
| | | * * * |
| 11 | Q. | Okay. The offer of judgment was sent while he was represented by other counsel? |
| 12 | | |
| 13 | A. | Correct. |
| 14 | Q. | But it was accepted when he was represented by you. Who discussed the offer of judgment with him and got his consent to enter into the offer of judgment? |
| 15 | | |
| 16 | A. | I would assume it was Jerry Busby. |
| 17 | | * * * |
| | Q. | How did you know it was acceptable for you to sign this acceptance on Mr. Thieman's behalf? |
| 18 | | |
| 19 | A. | I was instructed to sign it. |
| 20 | Q. | And who instructed you to sign it? |
| 21 | A. | Mr. Doyle instructed me to sign it after he resumed control of the file. |
| 22 | | |
| 23 | Q. | Okay. Did you have any discussions with Mr. Thieman at all about the fact that in accepting this offer of judgment, that Hannover ... had not paid any moneys on his behalf to resolve the case? |
| 24 | | |
| 25 | A. | I did not have those discussions with Mike Thieman prior to signing this. |
| 26 | *Id.* at p. 135, l. 16 through p. 138, l. 11. | |

7

1     Mr. Doyle was deposed on November 12, 2009.  He testified that he negotiated the settlement of the underlying case on behalf of Murray Transportation *and* Mr. Thieman.  Doyle deposition at p. 124, l. 1-3, attached as Exhibit 10 to Sentry's Motion to Disqualify (#185-5).  He was asked why he would represent Murray Transportation and Mr. Thieman "when there was a conflict of interest and you had Jerry Busby representing Thieman?"

> A.    Because there was no conflict of interest as it related to negotiating a settlement because the settlement was going to result in protecting both of them.  And if the settlement never occurred, then Mr. Thieman had separate counsel.
>
> Q.    Do you know why this covenant not to execute was not signed by Michael Thieman?
>
> A.    Why would it have to be signed by Mr. Thieman?  It was the plaintiff who was giving him a covenant and releasing him.
>
> \* \* \*
>
> Q.    Well, it's also a release, isn't it?
>
> A.    Well, but it's Otterstein releasing, not Thieman releasing anybody.  Why would he sign it?
>
> Q.    Because he's agreeing to allow himself to be exposed for 5.5-million-dollar judgment if he doesn't cooperate.
>
> A.    There would be no reason for him to sign it and that's part of the reason when you asked me earlier if he was exposed, my answer was no.
>
> Q.    So you don't think he's bound by this?
>
> A.    Oh, I think he's bound by it but I think that anyone that tried to enforce that judgment against him for lack of cooperation would have a difficult problem in light of the fact that he never signed the agreement.
>
> \* \* \*
>
> Q.    ... I don't understand.  This paragraph number 6 says that the plaintiff can execute against Thieman, but Thieman didn't agree to that.
>
> A.    It doesn't say the plaintiff can execute against Mr. Thieman.  It says Mr. Thieman will cooperate in pursuit of the claim against Sentry, and that if he does not cooperate they could try and execute.
>
> Q.    Exactly.

8

| | | |
|---|---|---|
|1| A. | So that's not they can execute against him. |
|2| Q. | How is it different? |
|3| A. | Because he controls it by cooperation. |
|4| Q. | What if he doesn't? |
|5-6| A. | Then I guess they could try and execute against him, but as I just pointed out, that seems to me it would be fairly difficult in light of the fact that Mr. Thieman wasn't required to sign the agreement. The plaintiffs never asked for that. |
|7-8| Q. | So to better understand the opinion that you've just expressed, is it your opinion that if Mr. Thieman decided not to cooperate that the plaintiffs would have no recourse against him? |
|9-10| A. | I don't have an opinion one way or another. I said it would be difficult. |

*Id.* at p. 124, l. 4 through p. 126, l. 13. Mr. Doyle further testified that he did not talk to Mr. Thieman or Mr. Busby about the Covenant Not to Execute or its terms, including its requirement that Mr. Thieman agree to accept an offer of judgment in the amount of $5.5 million. *Id.* at p. 115, ll. 6-15; p. 117, ll. 1-5.

## DISCUSSION

Federal courts apply state law in determining whether attorney disqualification is warranted. *In re County of Los Angeles,* 223 F.3d 990, 995 (9th Cir.2000) ("Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue.") (citations omitted). Nevada Rule of Professional Conduct 1.7 provides:

**Conflict of Interest: Current Clients.**

   (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
      (1) The representation of one client will be directly adverse to another client; or
      (2) There is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

9

> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
> (1) The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (2) The representation is not prohibited by law;
> (3) The representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> (4) Each affected client gives informed consent, confirmed in writing.

The burden of proof is on the moving party to present sufficient facts justifying disqualification. *Colyer v. Smith,* 50 F.Supp.2d 966, 967 (C.D.Cal.1999); *Weeks v. Samsung Heavy Indus. Co.,* 909 F.Supp. 582, 583 (N.D.Ill.1996); *see also Frazier v. Superior Court,* 97 Cal.App.4th 23, 36, 118 Cal.Rptr.2d 129 (2002) ("the courts should start off with the presumption that ... lawyers will behave in an ethical manner").  The Supreme Court of Nevada has stated that "[c]ourts deciding attorney disqualification motions are faced with the delicate and sometimes difficult task of balancing competing interests: the individual right to be represented by counsel of one's choice, each party's right to be free from the risk of even inadvertent disclosure of confidential information, and the public's interest in the scrupulous administration of justice." *Brown v. Eighth Judicial Dist. Court,* 116 Nev. 1200, 1205, 14 P.3d 1266 (Nev.2000) (citation omitted). Close cases are resolved in favor of disqualification. *Palmer v. Pioneer Inn Assocs.,* 19 F.Supp.2d 1157, 1162 (D.Nev.1998) ("Where disqualification is contemplated, 'any doubt is resolved in favor of disqualification.' " (citing *Faison v. Thornton,* 863 F.Supp. 1204, 1216 (D.Nev.1993))), *overruled on other grounds,* 338 F.3d 981 (9th Cir.2003).  To be sure, the court may "disqualify an attorney from representing a particular client in order to preserve the integrity of its judgment, [and] maintain public confidence in the integrity of the bar, ...." *Coles v. Arizona Charlie's*, 973 F.Supp. 971, 973 (D.Nev. 1997).

Disqualification, however, is a "drastic measure which courts should hesitate to impose except when absolutely necessary[,]" *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721-22 (7th Cir.1982), because it takes away one party's ability to choose his own representation, and it is often a tactic used to create delay or harassment. *Miller v. Alagna,* 138

10

F.Supp.2d 1252, 1258-59 (C.D.Cal.2000). Motions to disqualify are therefore subject to strict judicial scrutiny. *Optyl Eyewear Fashion International Corp. v. Style Companies, Ltd.,* 760 F.2d 1045, 1050 (9th Cir.1985). Courts have wide discretion in furthering the interests of fairness to all parties. *International Business Machines Corp. v. Levin,* 579 F.2d 271, 279 (3d Cir.1978).

In its Response (#190) to Sentry's Motion to Disqualify, Hannover points out correctly that as a general rule, only current and former clients have standing to seek disqualification of counsel due to a conflict of interest. *In re Yarn Processing Patent Validity Litigation*, 530 F.2d 83, 88 (5th Cir. 1976). Plainly, Sentry is neither a current nor former client of the Doyle Firm. Hannover therefore concludes that Sentry is without standing to seek the disqualification of Mr. Doyle and his firm. Hannover acknowledges that as an exception to the general rule a non-client may have standing to seek disqualification, if but only if the non-client demonstrates an injury that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *Colyer v. Smith*, 50 F.Supp.2d 966, 971 (C.D.Cal. 1999). Hannover contends that Sentry's argument ignores Mr. Doyle's own testimony, contains assertions that are "baseless" and "conclusory," and fails to meet Sentry's burden of demonstrating that the alleged conflict has caused or will cause any sort of injury to anyone. Response (#190) at 6. Hannover also notes that neither it nor Mr. Thieman has objected to Mr. Doyle and his firm's joint representation of them.

*1. Standing*

Generally, courts will not disqualify an attorney for conflict of interest unless the client, whether former or current, moves for disqualification. *In re Yarn*, 530 F.2d at 88. A non-client may, however, move to disqualify an attorney under limited circumstances.

> The current standard applied to non client motions to disqualify articulated in *Colyer v. Smith* requires a non client to show they have a "personal stake in the motion," *id*. at 971, because of an "ethical breach [that] so infects the litigation ... that it impacts the moving party's interest in a just and lawful determination of her claims...." *Id.* This is a two-step inquiry, and the alleged injury to the non

11

> client movant must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id*. at 973. This standard assures that non clients will not abuse the state rules of professional responsibility by using them as tactical measures to harass the opposition or cause delay.

*United States v. Walker River Irrigation District*, 2006 WL 618823 (D.Nev. 2006).

There is an additional ground on which a non-client may have standing to seek an attorney's disqualification. The court may "disqualify an attorney from representing a particular client in order to preserve the integrity of its judgment [and] maintain public confidence in the integrity of the bar." *Coles v. Arizona Charlie's*, 973 F.Supp. 971, 973 (D.Nev. 1997). Moreover, as noted in *Colyer v. Smith*, *supra*, 50 F.Supp.2d at 970, under the Model Rules of Professional Conduct, opposing counsel has an independent obligation to bring to the attention of the court "facts justifying a disqualification of counsel," even if opposing counsel does not represent the aggrieved client. *United States v. Clarkson*, 567 F.2d 270, 271 n.1 (4th Cir. 1977). *See also Brown & Williamson Tobacco Corp. v. Daniel International Corp.*, 563 F.2d 671, 673 (5th Cir. 1977)("Appellant has standing to seek disqualification even though it is not an aggrieved client because its attorneys are authorized to report any ethical violations in the case."); *In re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976)("When an attorney discovers a possible ethical violation concerning a matter before a court, he is not only authorized but is in fact obligated to bring the problem to that court's attention."). The Nevada Rules of Professional Conduct impose such an obligation. Rule 8.3(a) provides that "[a] lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority." Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to ... engage in conduct that is prejudicial to the administration of justice." And Rule LR IA 10-7(a) of this court's Local Rules of Practice provides, in pertinent part:

> An attorney admitted to practice pursuant to any of these rules shall adhere to the

standards of conduct prescribed by the Model Rules of Professional Conduct as adopted and amended from time to time by the Supreme Court of Nevada, except as such may be modified by this court. Any attorney who violates these standards of conduct may be disbarred, suspended from practice before this court for a definite time, reprimanded or subjected to such other discipline as the court deems proper.

Here, there is clear and convincing evidence that in the underlying state case and in this case the Doyle Firm had and continues to have a conflict of interest warranting disqualification, and that Sentry and Sentry's counsel have standing to move for disqualification. In March, 2006, after an unsuccessful effort to settle the state case, Mr. Doyle was aware he had a conflict of interest that precluded him from continuing to represent both Murray Transportation and Mr. Thieman. As he said in an email to Hannover, which had hired him to represent Murray Transportation and Mr. Thieman, "[O]n a practical level there is no question a conflict exists. ... I can't see how I can represent Thieman and do what is necessary to protect him while at the same time represent Murray." Exhibit 4 to Sentry's Motion (#185-1). Nevertheless, Mr. Doyle continued to engage in settlement discussions with Otterstein's counsel on behalf of Murray Transportation and Thieman concerning, among other things, "Mr. Thieman stipulating to a judgment and assigning his rights against Sentry for its failure to defend and protect him."

As settlement discussions were nearing fruition in May, 2006, arrangements were made for Jerry Busby to substitute in as counsel for Mr. Thieman in place of the Doyle Firm in order to avoid the appearance of conflict. Although the *appearance* may have been temporarily avoided, the *reality* wasn't. Mr. Doyle continued to serve two clients whose interests he believed were potentially adverse. Although Mr. Busby was Mr. Thieman's attorney of record, it wasn't Mr. Busby who represented Mr. Thieman at the negotiating table; it was Mr. Doyle. Mr. Doyle continued to negotiate on behalf of Mr. Thieman and Murray Transportation until a settlement was reached. At no time during the course of those negotiations did Mr. Doyle consult with or speak to Mr. Thieman or Mr. Busby. The settlement agreement with Mr. Otterstein required Hannover to pay $500,000.00 to Mr. Otterstein in return for dismissal of all

claims against Murray Transportation and Hannover. The agreement expressly noted that as to Mr. Otterstein's claims against Mr. Theiman, "other arrangements" had been made that would be contained in a separate agreement between Mr. Otterstein and Mr. Theiman.

Not surprisingly, Mr. Thieman didn't fare as well as Murray Transportation. On August 4, 2006, Mr. Doyle, who had been hired and paid by Hannover for his representation of Murray Transportation and Mr. Thieman, albeit under a reservation of rights, approved Mr. Otterstein's Covenant Not to Execute against Mr. Thieman, in which Mr. Otterstein agreed not to execute on any judgment stemming from the state action, *provided that Mr. Thieman accept an offer of judgment from Mr. Otterstein in the amount of $5.5 million, and agree to pursue a claim against Sentry for the benefit of Hannover*. The Covenant expressly provided that if Mr. Thieman didn't cooperate in pursuing any claim against Sentry, *Otterstein had the right to execute against the entire judgment of $5,500,000*. The Covenant was signed by Mr. Otterstein. It didn't call for Mr. Thieman's signature. Six months later -- on February 5, 2007 -- after the Doyle Firm had substituted back into the case as Mr. Thieman's attorney of record in place of Mr. Busby, Ms. Honodel of the Doyle firm signed on Mr. Thieman's behalf an Acceptance of Plaintiff's Offer of Judgment in the amount of $5.5 million. This document didn't call for Mr. Thieman's signature either. Ms. Honodel testified that she signed the Offer of Judgment because Mr. Doyle instructed her to do so. She did so without discussing it with Mr. Thieman. All Mr. Thieman was told by Mr. Busby was that the case had settled for $5.5 million, and nobody could "come after him" for any money. In short, all claims against Murray Transportation were dismissed, and Mr. Thieman was saddled with a $5.5 million judgment. It was not until he was deposed in this federal case more than two years later that Mr. Thieman learned that Mr. Otterstein could "come after him" if he didn't cooperate with Hannover in seeking reimbursement from Sentry.

Mr. Doyle's attempt during his November 12, 2009 deposition to explain away his continued representation of Mr. Thieman was disingenuous at best. On March 23, 2006, Mr.

Doyle correctly advised Hannover in an email that "I can't see how I can represent Thieman and do what is necessary to protect him while at the same time represent Murray," and that the interests of Thieman and Murray "are potentially adverse and I don't think we can represent both." In his deposition Mr. Boyle was asked why he would continue to represent both Mr. Thieman and Murray Transportation during the settlement negotiations when there was a conflict of interest and, in any event, Mr. Busby was Mr. Thieman's attorney of record. Mr. Doyle responded:

> Because there was no conflict of interest as it related to negotiating a settlement because the settlement was going to result in protecting both of them. And if the settlement never occurred, then Mr. Thieman had separate counsel.

In other words, while he was *defending* the two clients against Mr. Otterstein's complaint, the clients' competing interests were such that Mr. Doyle couldn't see how he could "do what is necessary to protect [Mr. Thieman] while at the same time represent Murray [Transportation]." But, according to Mr. Doyle, those same competing interests would not prevent him from fully protecting Mr. Thieman while representing Murray Transportation during *settlement* discussions with Mr. Otterstein. Aside from this explanation defying common sense and logic on its face, the end result of the negotiations belies Mr. Doyle's rationale: all claims were dismissed against Murray Transportation, and Mr. Thieman was subject to a $5.5 million judgment.

During his deposition Mr. Doyle took the position that Mr. Thieman wasn't really exposed to a $5.5 million judgment because he (Mr. Thieman) didn't sign the Covenant Not to Sue, which was signed only by Mr. Otterstein. When asked why Mr. Thieman didn't sign it, Mr. Doyle at first said, "Why would it have to be signed by Mr. Thieman? It was the plaintiff who was giving him a covenant and releasing him." The examiner, Lisa Zastrow, responded, "Because he's agreeing to allow himself to be exposed for a 5.5-million-dollar judgment if he doesn't cooperate." When Mr. Doyle repeated that there would be no reason for Mr. Thieman to sign the Covenant, Ms. Zastrow asked, "So you think he's not bound by this?" Mr. Doyle's response:

15

    Oh, I think he's bound by it but I think that anyone that tried to enforce that judgment against him for lack of cooperation would have a difficult problem in light of the fact that he never signed the agreement.

The rest of this exchange bears repeating.

> Q. ... I don't understand.  This paragraph number 6 says that the plaintiff can execute against Thieman, but Thieman didn't agree to that.
>
> A. It doesn't say the plaintiff can execute against Mr. Thieman.  It says Mr. Thieman will cooperate in pursuit of the claim against Sentry, and that if he does not cooperate they could try and execute.
>
> Q. Exactly.
>
> A. So that's not they can execute against him.
>
> Q. How is it different?
>
> A. Because he controls it by cooperation.
>
> Q. What if he doesn't?
>
> A. Then I guess they could try and execute against him, but as I just pointed out, that seems to me it would be fairly difficult in light of the fact that Mr. Thieman wasn't required to sign the agreement.  The plaintiffs never asked for that.
>
> Q. So to better understand the opinion that you've just expressed, is it your opinion that if Mr. Thieman decided not to cooperate that the plaintiffs would have no recourse against him?
>
> A. I don't have an opinion one way or another.  I said it would be difficult.

After evasively going round in circles trying to show that the $5.5 million judgment did not put Mr. Thieman in harm's way financially, Mr. Doyle ducked Ms. Zastrow's pointed question: is Mr. Thieman free and clear even if he *doesn't* cooperate with Hannover?  Mr. Doyle responded simply that he didn't have an opinion "one way or another."  Such testimony hardly supports Mr. Doyle's current view that there was and is no conflict of interest.

    Finally, as Sentry points out, Sentry itself faces potential injury as a result of the Doyle Firms' conflicted representation of Hannover and Mr. Thieman.  That Thieman was inadequately represented in the underlying case and has been inadequately represented in this

16

case due to the Doyle Firm's conflict has an adverse impact on Sentry. Instead of attempting to settle Mr. Otterstein's claims against Mr. Thieman within Hannover's $1,000,000 policy limits, the Doyle Firm (without Mr. Thieman's knowledge) agreed to accept an offer of judgment on Mr. Thieman's behalf in the amount of $5.5 million. If the Doyle Firm had been conflict free in its representation of Mr. Thieman, it could have advised Mr. Thieman to file a bad faith action against Hannover for failing to settle with Mr. Otterstein within Hannover's $1,000,000 policy limits. Instead, on behalf of Mr. Thieman, the Doyle Firm filed a counterclaim for bad faith against Sentry, the success of which would substantially benefit Hannover under the terms of the underlying settlement agreement and covenant not to execute.

For all of these reasons, and for good cause shown,

IT IS ORDERED that to the extent the Motion to Disqualify (#185) seeks an order disqualifying William Doyle and Mr. Doyle's law firm from representing Michael Thieman and the Insurance Corporation of Hannover, it is granted.

IT IS FURTHER ORDERED that to the extent it seeks an order disqualifying Amy Honodel, the Motion to Disqualify (#185) is denied as moot.

The Clerk of Court is directed to mail copies of this order to defendants Thieman and Hannover at the following addresses:

Donna Lister  
Insurance Corporation of Hannover  
P.O. Box 49129  
Greensboro, NC 27419

Michael Thieman  
5865 Pierce Street  
Arvada, CO 80003

DATED this 23rd day of March, 2011.

*[signature]*

**LAWRENCE R. LEAVITT**  
**UNITED STATES MAGISTRATE JUDGE**

17